**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**v.**                                   **No. 2:17-cr-01032-RB**

**ALBERTO TERRAZAS-IGNACIO,**

        **Defendant.**

## SENTENCING MEMORANDUM
## FOR DEFENDANT ALBERTO TERRAZAS-IGNACIO

Defendant Alberto Terrazas-Ignacio, through counsel, the Law Office of Ryan J. Villa, by Ryan J. Villa, submits this sentencing memorandum to assist the Court in the crafting a sentence for Alberto under 18 U.S.C. § 3553(a) that "sufficient but not greater than necessary" to achieve the purposes of sentencing. As discussed below, a sentence of ten years, is sufficient to accomplish the statutory mandate and meet the goals of sentencing. Alberto's proposed sentence is consistent with the fundamental principle that the sentencing Court should "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

### BACKGROUND

Alberto Terrazas-Ignacio is currently 25 years old.  He was only 23 when he committed the offenses for which the Court will sentence him.  Alberto is the father of two young children, his daughter, who is now 5, and his son, who was born while he has been in custody, who is 1. Their mother is Alberto's long-time girlfriend, co-defendant Roderica Bahe. Ms. Bahe is currently awaiting sentencing following entry of her plea agreement on August 2, 2018.  *See* Doc. 528.  Per that Agreement, she and the government have entered into a Rule 11(c)(1)(C) agreement to a

1

specific sentence of 48 months.  The children are living in Albuquerque with Ms. Bahe's sister, who receives Medicaid, TANF and food stamps through the State.  *See* PSR, ¶ 53.  Ms. Bahe wrote a letter to the Court on Alberto's behalf, which is identified as **Exhibit 1**.[1]  Ms. Bahe's other sister also wrote a letter discussing how she views Alberto as an amazing father.  *See* **Exhibit 2**.  Alberto has only seen his son once due to restrictions on visitation at the Luna County Detention Center, but he gets to speak to his children by phone regularly.

Alberto was born and raised in Las Cruces by his mother and father. He has one older and two younger brothers.  As a child he struggled with asthma and ADHD.  He was hospitalized for asthma around the age of 8.  When he was 13, he was given medication for ADHD to address his hyperactivity.   Several of his family and friends wrote letters on his behalf, including his mother,[2] brother, and several friends.   These letters are collective identified as **Exhibit 3**.  Included in **Exhibit 3** as well are several photos of Alberto's children, along with their mother and father.

Alberto's highest level of education is 9th grade.  He dropped out in his 10th grade year. He has yet to obtain his GED, which he was working toward while being detained at the Otero County facility, but was unable to complete before he was transferred, without explanation, to Dona Ana County and then Luna County. The Luna County facility has no GED program and no other programs for inmates being held there.  He plans to obtain his GED and is interested in studying to become an electrician.

Although he has managed the condition quite well, Alberto suffers from an anoxic brain injury that was the result of an accidental overdose when he was a teenager.  In December of 2010

---

[1] Counsel is filing all letters to the Court under seal, and under separate cover, due to the nature of the letters.

[2] His mother's original letter is in Spanish.  Counsel's staff translated the letter to English for the Court. Both are included in **Exhibit 3**.

he was found unresponsive by a friend after they found the friend's older brother's methadone pills and ingested some of them.  *See* **Exhibit 4**, UNM Hospital Medical Record Excerpt, at p. 1.[3]  He went to the hospital in Las Cruces where doctors had to intubate him so he could breathe.  *Id.*  He was transferred to the University of New Mexico (UNM) Pediatric Intensive Care Unit where he was placed on mechanical ventilation for nearly two weeks.  *Id.*   He also had to be placed on a feeding tube.  *Id.*   Early on he was in a coma and had a grim prognosis.  *See* **Exhibit 5**, Consultation Notes, Dr. Vickers.  His doctors believed that his chances of having a meaningful recovery were extremely poor.  *See* **Exhibit 6**, Consultation Notes, Dr. Vickers.  Despite this initial prognosis, Alberto improved greatly and ultimately recovered enough to be released to a rehabilitation hospital.

Because of this injury, Alberto underwent a forensic examination by Dr. Eric Westfried for this case.  Dr. Westfried found he has a neurocognitive disorder as well as a personality change as a result of the injury.  *See* **Exhibit 7**, Forensic Neuropsychological Diagnostic Evaluation of Dr. Eric Westfried.[4]  Dr. Westfried's CV is being provided as **Exhibit 8**.  Dr. Westfried's report indicates that throughout the examination, he consistently had flat affect.  *See* **Ex. 5**. at 5. Alberto's mental status examination indicated no severe cognitive deficits or severe mental illness.  *Id.* at 6.  There were potential problems identified with concentration, memory, and visuospacial functions, but he scored within normal ranges.  *Id.*  Dr. Westfried went on to administer a battery of neuropsychological tests which are set out on page 6 of the report.  The results, which are set out on pages 6 through 8 of the report show that Alberto has mild to moderate impairment of his manual motor functions, attention/concentration and processing speed, and executive functioning.

---

[3] Due to the confidential nature of these records, they are being filed sealed, under separate cover.

[4] Due to the confidential nature of this report, it is being filed sealed, under separate cover.

His memory in the visual domain is severely impaired.  *Id.* at 8.  Dr. Westfried's diagnostic impression was that Alberto's neuropsychological test scores are consistent with diagnoses of a neurocognitive disorder due to severely impaired visual memory functions, and mild to moderate impairment of his manual motor functions, attention/concentration and processing speed, and executive functioning.

## SENTENCING ANALYSIS

The calculation of Alberto's advisory Guideline range starts with the weight of the drugs involved in the offense.  Under the 2018 Guidelines' § 2D1.1(c) Drug Quantity Table, when an offense involves different controlled substances, each substance is first converted to a converted drug weight ("CDW") using the Drug Conversion Tables. See § 2D1.1 Application Note 8 (B) (describing the means for combining different controlled substances to reach a single offense level); Application Note 8 (D) (providing the Drug Conversion Tables, which lists specific substances and their corresponding CDW). Next, the CDW of all the substances is totaled and the sum serves as the starting point for the base offense level as ascribed in the Drug Quantity Table. See § 2D1.1(c) Drug Conversion Table.

In this case, Alberto pleaded guilty to offenses involving different controlled substances in the following unconverted drug quantities: 13.52 kilograms (kg) of heroin, 0.987 kg of cocaine, 5.576 kg of methamphetamine and 4.82 kg of methamphetamine actual. PSR ¶ 29; Plea [Doc. 419].  After calculating the converted drug weight for each substance in the Drug Conversion Table and totaling, the CDW of all the substances involved is 121,269.40 kg, which results in a base offense level of 38. PSR ¶ 29.

Due to the Guidelines' differential treatment of methamphetamine mixture versus methamphetamine actual, as shown below, the CDW of the 4.82 kg of methamphetamine actual is

4

primarily responsible for the dramatic increase of Alberto's base offense level. This is because the Drug Conversion Table converts methamphetamine mixture and methamphetamine actual at a ratio of 1:10, meaning that every 1 gm of methamphetamine mixture converts to 2 kg CDW while every 1 gm of methamphetamine actual converts to 20 kg CDW. Based on the disproportionality of the methamphetamine mixture and methamphetamine actual ratios, one could reasonably assume that the Sentencing Commission must have a good reason for treating the substances so differently. Such an assumption, however, would be wrong.

Provided below are Probation's calculation of Alberto's total offense level and advisory Guideline range as well as Alberto's objections.  The next section lays out the grounds on which the Court should grant Alberto a downward variance to ten years, the mandatory minimum sentence.  Alberto asks the Court to vary downward from the recommended Guideline range, which encompasses the 240-month maximum indicated in the plea agreement. Alberto argues that because the methamphetamine Guidelines, which are responsible for the lion's share of the increase to his base offense level, are not the product of the Sentencing Commission's institutional strengths – assessing and applying empirical data to inform and sentencing policy – and produce unwarranted non-uniformity in punishment between cases involving methamphetamine mixture versus methamphetamine actual, the Court should not rely on them on as the basis for crafting his sentence. The consequence of the ratios, as demonstrated in Alberto's case is that the methamphetamine guidelines yield excessively long and punitive advisory sentences. Instead of relying on the inflated advisory Guideline range, Alberto asks that the Court sentence him pursuant to § 3553(a)(2) and in conclusion, provides the Court with additional grounds to vary downward based on the factors set out in § 3553(a)(2).

## I.    Calculating Offense Level

In the PSR, probation calculated the base offense level at 38 based on the CDW, *see* PSR ¶ 29, and neither party has filed any objections to this amount.  Probation applied an enhancement of two levels pursuant to the conviction under 18 U.S.C. § 1956.  Mr. Terrazas-Ignacio filed an objection to this enhancement.  *See* Objections, ¶ 2 [Doc. 586].  The government failed to file any response within the applicable time period to do so.  Accordingly, the Court should sustain this objection.  No victim, role or obstruction adjustments were applied and neither party filed any objections. PSR ¶¶ 31-33. Mr. Terrazas-Ignacio received a three-level reduction for acceptance of responsibility, which made his total offense level a 37.  *Id.* ¶¶ 36-38.[5]  Should the Court sustain the objection to the money laundering enhancement, the offense level would be 35. If it overrules the objection, 37 is the correct offense level before any variances.

Mr. Terrazas-Ignacio's criminal history was calculated to be a category II, based on three criminal history points.  Mr. Terras-Ignacio objected and argued that the point that was counted in paragraph 41 of the PSR for possession of alcoholic beverages by a minor should not be counted because it is similar to a juvenile status offense.  *See* Objections, ¶ 3 [Doc. 586].  The government did not file a response and as a result, this Court should sustain the objection.  In either case, the criminal history category would remain unchanged.

In paragraph 47, the PSR noted pending charges in Oklahoma for drug trafficking.  Counsel for Mr. Terrazas-Ignacio informed the PSR writer that this charge was part of the same conduct that formed the basis for the instant Indictment.  The writer responded that the PSR would be updated to reflect this, but to date no addendums have been filed.  In addition, counsel asked the

---

[5] Although it does not affect this reduction, the PSR indicated that Mr. Terrazas-Ignacio, through counsel declined to provide his version of the instant offense.  PSR ¶ 24.  However, at the PSR interview, counsel requested probation use the factual basis set out in the Plea Agreement.  Correspondence was sent to the PSR writer reminding him of this request and the writer responded that the PSR would be redisclosed and this information would be included, but to date that has not occurred.

attorneys for the government to contact the prosecuting agency in Oklahoma to inform it of the disposition of this case and request Oklahoma dismiss these charges as a result.  In fact, Mr. Terrazas-Ignacio's co-defendant, Ms. Bahe, was also charged in this case and as the result of this federal case, Oklahoma dismissed the charges against her.  However, as of this filing, due to staffing changes in the Oklahoma prosecuting agency's office, Mr. Terrazas-Igancio's case has not been dismissed.  Although this does not affect the criminal history score or offense level, the pending nature of this warrant will have an adverse impact on BOP's designation and classification of Mr. Terrazas-Ignacio, meaning he could be incarcerated in a higher level security facility as a result.

With the offense level of 37 and criminal history category II, the guideline range is 235 to 293 months.  With an offense level of 35 and category II, the range is 188-235 months.  The maximum possible sentence called for by the Plea Agreement is 240 months.  Because the mandatory minimum sentence is 10 years or 120 months, this Court has the discretion to sentence Mr. Terrazas-Igancio between 120 months to 240 months.

## II.  Fashioning an Appropriate Sentence under 18 U.S.C. § 3553(a)(2)

Under § 3553(a), a sentencing judge must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).  Those purposes are:

> (2) the need for the sentence impose –
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide a judge punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  In choosing the sentence that complies with the "overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to achieve the goals of sentencing, *Kimbrough v. United States*, 552 U.S. 85, 89 (2007), the judge "shall consider" the nature and circumstances of the offense and the history and characteristics of the defendant, § 3553(a)(1); the purposes of sentencing, § 3553(a)(2); the kinds of sentences available by statute, § 3553(a)(3); the kinds of sentence and sentencing range recommended by the Guidelines and any pertinent policy statement issued by the Sentencing Commission, § 3553(a)(4) & (5); the need to avoid unwarranted disparities, § 3553(a)(6) (emphasis added); and the need to provide victim restitution, § 3553(a)(7).

A.  **Due to fundamental flaws in the Sentencing Commission's methamphetamine guidelines, this Court should vary from the PSR's advisory range and look to more appropriate "starting points" to accomplish the purposes of sentencing under 18 U.S.C. § 3553(a)(2).**

Because Alberto's advisory Guideline range is artificially inflated by flawed and uninformed sentencing policy, this court should grant his request for a variance.  Judges are free to disagree with policies underlying a Guideline if they result in a sentence recommendation "greater than necessary" to achieve the purposes of sentencing and may reject policies established by Congress and incorporated into the Guidelines by the Sentencing Commission. *Kimbrough v. United States*, 552 U.S. 85 (2007).  Because the district courts are tasked with crafting sentences that comply with the purposes of § 3553(a)(2), when a court imposes a sentence outside the Guideline recommendation and provides their reasoning, they give important feedback to the Sentencing Commission so that the Guidelines can evolve constructively over time. *See United States v. Booker*, 543 U.S. 220 (2005); *Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough*, 552 U.S. 85 (2007); *Spears v. United States*, 555 U.S. 261 (2009); *Nelson v. United States*, 555 U.S. 350 (2009). The flow of information, including reasoned

disagreement from sentencing judges to the Sentencing Commission is encouraged; accordingly sentencing judges may vary from guideline ranges "based solely on policy considerations [ ] with the Guidelines," *Kimbrough*, 552 U.S. at 570, and when they do, the courts of appeals may not "grant greater factfinding leeway to [the Commission] than to the district judge." *Rita,* 551 U.S. at 347. After all, the "Guidelines are not only *not mandatory* on sentencing courts; they are also not to be presumed reasonable." *Nelson*, 555 U.S. at 352 (emphasis in original).  This cannot be any truer than when the advisory Guideline range is not the result of the "Commission's exercise of its characteristic institutional role, such as when they are not based on any identified empirical approach," but rather derived from congressional and, therefore, inherently political directives. *United States v. Ortega*, No. 09-CR-400, 2010 WL 1994870 at * 4 (D.NE May 17, 2010). "Consequently, the Guidelines that are not based on empirical evidence are a less reliable appraisal of a fair sentence." *Id*. (citing *Kimbrough*, 522 U.S. at 574-75).

Reminiscent of the widely criticized flaws in the crack/powder cocaine ratios, sentencing courts across the country, confronted with sentencing disparities that result from the application of the methamphetamine mixture/actual ratios, are increasingly scrutinizing the similar and inherent failures in the Commission's methamphetamine sentencing guidelines. *Ortega*, 2010 WL 1994870; *United States v. Hartle*, No. 16-CV-00233, 2017 WL 2608221 (D. Idaho June 15, 2017); *United States v. Ibarra-Sandoval*, 265 F.Supp.3d 1249 (D. NM 2017); *United States v. Nawanna*, 321 F.Supp.3d 943 (N.D. Iowa 2018); *United States v. Ferguson*, No. CR 17-204, 2018-WL-3682509 (D. Minn. Aug. 2, 2018); *United States v. Breshears,* No. 17-CR-00333, 2018 WL 5924502 (D. Idaho Nov. 09, 2018).

In Alberto's case, the PSR suggests an advisory Guideline range of 235 months to 293 months and notes that pursuant to the plea agreement that the parties have stipulated "that a

sentence of *no more than* 240 months is the appropriate sentence in this case." PSR ¶ 93 (emphasis added). Probation determined Alberto's advisory range of 235-293 months after calculating his criminal history category and total offense level. *Id*. ¶ 75.  As discussed above, Alberto's offense level is determined by the drug quantity and CDW, which results in  a base offense level of 38.

Given that Alberto's steep advisory guideline range is the product the Commission bypassing its customary empirical process and bowing to political pressure, *id*.; *see also United States v. Hayes*, 948 F. Supp.2d, 1099, 1021-22 (N.D. Iowa), this Court should vary downward and sentence Alberto to ten years, as such a sentence is "is sufficient but not greater than necessary, to comply with the purposes set forth in paragraph (2)" of 18 U.S.C. § 3553(a).

### 1.  This Court has the authority to sentence Mr. Terrazas below the PSR advisory guideline range.

It is well-established that the Guidelines are no longer mandatory, however, as "a matter of administration and to ensure consistency, a district court should begin all sentencing proceedings by calculating the applicable Guidelines range" *Ibarra-Sandoval*, 265 F.Supp.3d at 1251, citing *Gall*, 552 U.S. 38, 49, which "serve[s] as a starting point and initial benchmark" for the district court in crafting a sentence. *Ibarra-Sandoval*, 265 F.Supp.3d at 1251. After due consideration of the Guidelines, the court is "free to make its own reasonable application of the § 3553(a) factors" and reject an advisory Guideline range. *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring). Importantly, the court should not presume the Guidelines are reasonable but "must independently consider all the sentencing factors in 18 U.S.C. 3553(a) to determine the appropriate sentence." *Ibarra-Sandoval*, 265 F.Supp.3d at 1251 (internal authorities omitted).

In cases where the "district court finds the § 3553(a) factors support an outside-Guidelines sentence," the court may depart from the advisory Guideline range. *Id*.   Reasons for departure include policy disagreements with the Guidelines. *Id*. at 1251-52.  This point was underscored in

*Spears v. United States*, 555 U.S. 261, 129 (2009), when the Supreme Court "reiterated that policy deviations from the Guidelines need not be based on a particular defendant's individual circumstances, [instead] all that is needed to justify a variance—even in a mine-run case—is the sentencing court's disagreement with the Guidelines." *Id*. at 1252. *See also Gall*, 522 U.S. at 49 (rejecting the notion that "extra ordinary circumstances [are required] to justify a sentence outside the Guidelines range"). As a result, district courts are now invited to consider arguments that the Guideline itself fails properly to reflect § 3553(a)'s considerations, do not treat defendant characteristics properly, or that a different sentence is appropriate regardless of the advisory Guideline range. *Rita*, 551 U.S. at 351.

Whether a sentencing judge may draw any useful advice from an advisory guideline depends on whether the Commission acted in "the exercise of its characteristic institutional role." *Kimbrough*, 128 S. Ct. at 575. The exercise of the Commission's institutional role has its foundation in two basic components: (1) reliance on empirical evidence, and (2) feedback from the district court in the form of judicial decisions, sentencing data, and comments from litigators and experts in the field. *Rita*, 551 U.S. at 349-50. Important here is the fact that *none* of the drug Guidelines, including the methamphetamine ratios, are tied to empirical evidence, national experience, or benefit from the recommendations from participants in the field. *Gall*, 552 U.S. 73 n.2 (2007) (explaining that the "Commission departed from the empirical approach when setting the Guidelines range for drug offenses and chose instead to key the Guidelines to the statutory mandatory minimum sentences that Congress established for such crimes"); *see also United States v. Santillanes*, 274 Fed. Appx. 718, 718-19 (10th Cir. 2008) (remanding for resentencing because it was error for the district court to refuse to address defendant's argument that the court should

reject the guidelines' policy of treating methamphetamine mixture differently from methamphetamine actual).

It follows that when a Guideline is not the product of "empirical data and national experience," it is not an abuse of discretion to conclude that it fails to achieve § 3553(a)'s purposes, even in "a mine-run case." *Kimbrough*, 552 U.S. at 575.  Therefore, the district court has the authority to deviate from the Guideline's recommendation and craft a sentence that actually complies with the purposes of § 3553(a).

When crafting such a sentence, the district court is ultimately being asked to impose a sentence that is reasonable. *Gall*, 522 U.S. at 51.  When the court imposes a sentence that falls outside the Guidelines, "it must consider the extent of the deviation to ensure that the justification is sufficiently compelling to support the degree of variance" and explain the reasons for the variance. *Id*. at 50.  In Alberto's case, the explanation for a downward variance is easy: A Guideline sentence of 20 years that is predicated on the Commission's abandonment of its institutional strengths in favor political expediency, results in sentencing disparities and nonuniformity and is far greater than necessary to fulfill the purposes of sentencing.  Such a sentence is extraordinarily punitive in light of the flaws in the Guidelines' methamphetamine ratios and Alberto's personal circumstances and family history.

### 2.   The Guidelines' Meth Ratios are Flawed Because They Are the Product of Political Calculation and Compromise – Not Empirical Analysis.

Drug weights are a poor proxy for determining the appropriate sentence for a criminal defendant and result in excessive sentences. For federal drug crimes, a defendant's base level is calculated "using the Drug Quantity Table, found in §2D.1(c) of the [ ] Guidelines, which uses a graduated scale based on the type and quantity of the drugs involved." *Breshears*, 2018 WL 5924502, at * 2. Unlike most drugs, methamphetamine is "quantified based on purity, using either

the weight of a mixture containing the drug or the weight of the pure drug itself contained within the mixture, whichever yields the greater offense level." *Id.* The impact of the Guidelines' distinction of methamphetamine mixture/actual is most evident in the Drug Conversion Tables, which indicates a 1:10 ratio between methamphetamine mixture versus methamphetamine actual. *See* Drug Conversion Table, § 2D1.1 Application Note 8 (D). The Drug Conversion Tables assigns 1 gm of methamphetamine mixture a CDW of 2 kg, while 1 gm of methamphetamine actual has a CDW of 20 kg. *Id.*

In Alberto's case, this means that once the drug conversion ratios are applied, 5.576 kg of methamphetamine mixture is assigned a CDW of 11,152 kg, while 4.82 kg of methamphetamine actual changes to a staggering CDW of 96,400 kg. In reality, the weight difference between the 5.576 kg of methamphetamine mixture and 4.82 kg of methamphetamine actual is 0.756 kg. or a little more than 1.5 pounds. However, after calculating the CDW of both substances, the compounding effect of the 1:10 ratio produces a much more shocking difference. Because of the methamphetamine ratios, the difference between 4.82 kg of methamphetamine actual (or 96,400 kg CDW) and 5.576 kg of methamphetamine mixture (or 11,152 kg CDW) is 85,248 kg. Due to the 1:10 methamphetamine mix/actual ratios, even with a criminal history category of zero, Alberto's advisory Guideline range would be a staggering 235-293 month or nearly 19.5-24.4 years.  It also defies reason to suggest Alberto is somehow more culpable than a similarly situated defendant because of the pure nature of the drug.

There is no empirical data or academic literature justifying the 1:10 ratio. *Breshears,* 2018 WL 5924502, at * 2. As Chief Judge Winmill discusses in her sharp criticism of the lack of empirical support for the methamphetamine mixture/actual distinction: "I have tried to determine whether there is *any* empirical data from the Sentencing Commission or in academic literature

which would justify the ratio.  I have found none." *Id*. (emphasis added) Rather, the only explanation for methamphetamine mixture/actual distinction appears to be similar ratios used in mandatory minimum sentencing statutes enacted by Congress. *Id*.  *See also* 21 U.S.C. § 841(b)(1)(A)(viii) & § 841(b)(1)(B)(viii). A "determination [that] was, by its very nature, a product of political calculation and compromise rather than empirical analysis." *Id*. Plainly put, instead of relying on an empirical analysis, the "Commission simply keyed the Guidelines range to the statutory mandatory minimums sentences Congress established for drug crimes." *Ibarra-Sandoval*, 265 F.Supp.3d at 1253. "Consequently, the drug offense Guidelines are not a reflection of the Commission's institutional strengths, and a district court has more discretion to vary from the drug offense Guidelines based on policy disagreements than in a case where the applicable guidelines were promulgated pursuant to the Commission's usual empirical approach." *Id*.

In Alberto's case, Probation applied the Drug Conversion Tables' ratios to calculate a total CDW of 121,269.4 kg. PSR ¶ 29. Probation arrived at this total weight by differentiating the drugs involved in the offense including methamphetamine mixture, 5.576 kg, and methamphetamine actual, 4.82 kg. *Id*. Using the conversion ratio which indicates that every 1 gm of methamphetamine is converted 2 kg of CDW, the 5.576 kg methamphetamine mixture converts to 11,152 kg. *Id*. If the Guidelines treated methamphetamine actual the same way, then 4.82 kg methamphetamine actual would convert to 9,640 kg. That change alone would reduce Alberto's total convert drug weight from 121,269.4 kg to 34,509.4 kg resulting in a new base offense level of 16 instead of 38. *See* Drug Quantity Table § 2D1.1 (c) (12) (setting a base offense level of 16, where the drug quantity involved "[a]t least 20 kg but less than 40 kg of converted drug weight").

Accepting Probation's criminal history score of three and a criminal history category of II, Alberto's guideline range would be 24-30 months or 2-2.5 years. However, because the

"Commission simply keyed the Guidelines range to the statutory mandatory minimums sentences," *Ibarra-Sandoval*, 265 F.Supp.3d at 1253, under the current methamphetamine actual ratio, 1 gm of methamphetamine actual inflates to 20 kg of CDW. This means that the 4.82 kg methamphetamine actual in question, converts to 96,400 kg. This baseless disparity is even more outrageous when the Court considers that if for whatever arbitrary reason, the 4.82 kg of methamphetamine actual in Alberto's case was not tested for purity, the methamphetamine mixture ratio would apply as the "practical effect of the ratio is to impose a presumed purity of 10% for untested methamphetamine mixtures." *Breshears,* 2018 WL 5924502, at * 2.

The Court should use its discretion in Alberto's case and sentence him to 10 years,[6] as such a sentence is sufficient given the seriousness of the offenses, but not so punitive and arbitrary to undermine the goals of sentencing and deprive Alberto, and his family, of the next 20 years of his life.

### 3. By granting Mr. Terrazas a variance, the Court will adhere to the USSG mandate of imposing a sentence that is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a)(2).

Recently, United States District Court Judges have increasingly voiced their concerns regarding the disparate effect of the methamphetamine mixture/actual distinction, see *supra* at 5 (citations to recent decisions), including that the premise for the distinction that the drug purity is a proxy for criminal culpability, is outdated. See § 2D1.1 (D) Application Note 27(C) (suggesting that the purer the drug quantity, the closer to source in the chain of production and distribution the defendant was operating). However, as Chief Judge Winmill notes, "purity levels of drug seized in the 10% range were common until approximately 20 years ago, [but] [r]ealities on the ground have changed." *Breshears,* 2018 WL 5924502 * 2. The new reality is that from a purity

---

[6] Mr. Terrazas-Igancio submits that 10-year sentence for his drug crimes is unconscionable.  However, due to the mandatory minimum, he argues for that sentence as it is the lowest the Court can go.

perspective, most of the methamphetamine currently seized qualifies as methamphetamine actual. *Id*. This Court has also acknowledged the increase in purity within the methamphetamine market explaining that the "average purity of methamphetamine has increased to over 90 percent." *Ibarra-Sandoval*, 265 F.Supp.3d at 1255-56. The Court's assessment tracks recent data published in the July 2018 report by the Drug Enforcement Agency, stating that analysis of methamphetamine purity for 2016, the timeframe applicable to Alberto's charges, remained at record highs.[7]   The report further indicates that throughout 2016, the purity of methamphetamine "remained relatively stable at 94 percent." *Id*.



Note: The "adjusted" price and purity figures plotted above are expressed as standardized values, in proportion to the overall distribution of seizures by amount purchased. Drug prices are quoted as "price per gram pure" (PPG) and should not be interpreted as the actual "street price" for each drug.

Source: DEA

2016 National Drug Price and Purity Data, DEA Intelligent Report at 4.   "[T]oday's high average methamphetamine purity means that most defendants [will] be sentenced according to the harsher methamphetamine-actual Guidelines when the methamphetamine is tested for purity," as it was in

---

[7] Available at: https://ndews.umd.edu/sites/ndews.umd.edu/files/dea-2016-national-drug-price-purity-data.pdf.

Alberto's case. However, the "reasons why testing is or is not performed in any case are completely

arbitrary." *Breshears,* 2018 WL 5924502, at * 3. As Chief Judge Winmill further explains:

> In many cases, only some of the drugs were seized and available for testing. In others, the testing lab was too busy to complete testing before sentencing. In some, the wise defendant pled guilty early in the case so that sentencing would occur before testing could be completed. In many cases, the prosecution originated with a state agency where testing could not be completed in a timely manner. Regardless, none of these reasons relate to the defendant's culpability or the danger which he or she poses to society.

*Id.* Instead of helping the Court craft a reasonable sentence, the methamphetamine ratios create

"arbitrary and irrational distinctions between sentences imposed upon similarly situated

defendants." *Id.* Accordingly, in order correct the arbitrary distinction created by the Guidelines

and to comply with the goals of sentencing articulated in § 3553(a) this Court should vary

downward to 120 months. By doing so, the Court will not only hand down a "sentence that is

sufficient but not greater than necessary" given Alberto's individual culpability but will also assist

in the "continued evolution of the Guidelines to better accomplish its Congressional mandate

[which] depends on interplay between the sentencing judge and the appeals court and

Commission." *Ibarra-Sandoval*, 265 F.Supp.3d at 1257 (citing *Rita*, 551 U.S. at 350).

**B. The remaining factors under Section 3553(a) support a variance to ten years due to Alberto's impairment that resulted from his brain injury, his need to care for his children, and his youth at the time of the offense.**

**Alberto's circumstances:** Alberto was a cognitively impaired, 23-year old, without a high

school diploma at the time he committed these crimes. He should be sentenced accordingly.

Experience teaches that youth are more often less culpable than similarly situated older defendants.

So does science. Numerous studies and news reports citing prominent neurologists and

neurological studies have indicated that the brain continues to mature well into a person's 20s.

Add to this that Alberto suffered from impairment due to his brain injury and his lack of education,

the Court should consider these mitigating circumstances.  What is more, as with many first time federal defendants, Alberto had no idea of the extremely severe, and draconian mandatory minimum sentences available for the crimes he was committing.  To be sure, he knew what he was doing was wrong and illegal.  He knew he should not have been doing it.  What he did not know was that it would have the potential to leave him incarcerated for the entire childhood of his children.  Even among educated individuals, few are aware of these consequences.  For those who are uneducated like Alberto, finding anyone aware of these consequences is like finding a needle in a haystack.

**Family history, father to an infant child:** Importantly, the Tenth Circuit has repeatedly acknowledged that sentencing courts are mandated under § 3553(a) to consider family circumstances as part of a defendant's "history and characteristics" when fashioning the appropriate sentence. *See, e.g., United States v. Vargas-Ortega*, 736 Fed. Appx. 761 (10th Cir. 2018) (unpublished) (reversing and remanding for resentencing where the district court erred in stating it could not vary downward based on family circumstances).  Here, Alberto has two young children that need their father in their lives.  Ten years is an incredible amount of time to take him away from the children for a drug crime.  Any more than that is a tragedy.  He can still have a meaningful effect on their lives after serving such a sentence.  A twenty-year sentence as called for by the Guidelines would have him released when his children are already adults, and have grown up without a father.  This Court has surely seen numerous defendants who have likely found themselves before the Court, in part, due to the lack of having a parent, usually a father, in their lives. This Court's sentence could thus impact whether Alberto's children ultimately go on to become successful, or perhaps find themselves standing before a sentencing court in the future. Alberto has learned the hard way that drug trafficking can leave him imprisoned longer than many

18

violent crimes.  If given the chance, his children do not have to make the same mistake and he and their mother can guide them away from the mistakes they have made.

**The need for medical and mental health treatment and rehabilitation**.  Alberto certainly needs treatment for his drug abuse as well as educational and vocational rehabilitation. A sentence of 10 years will allow him to complete the 500-hour drug program, obtain his GED and obtain further education and training. A longer sentence is not needed to obtain these goals. He also needs help managing his cognitive disorder and recognizing the mental health problems that come along with it.  The Marshall Project recently documented the severe decline in mental health treatment inside the Bureau of Prisons (BOP).  *See* "No One to Talk You Down": Inside federal prsions' dangerous failure to treat inmates with mental-health disorders, Christie Thompson and Taylor Elizabeth Eldrige (Nov. 21, 2018), Washington Post.[8] The article noted that the BOP "classified just 3 percent of inmates as having mental illness seriousness enough to require regular treatment."  *Id.*  By comparison, in California more than 30 percent receive care and in Texas and New York it is approximately 20 percent.  *Id.*  The article pointed to a pointed to a 2014 policy change that required more care for inmates with mental health disorders but quoted former BOP psychiatrists as saying the BOP never allocated additional resources to provide for the care. *Id.* The article cited an inspector general's report that found psychologists were more likely to increase an inmate's care level when reviewing their mental health status, but after the rule change, they were more likely to downgrade prisoners.  *Id.*

It cannot be meaningfully disputed that Alberto will receive better care for his brain injury in Albuquerque once he is released from incarceration, than anywhere in the BOP.

---

[8] Available at https://www.washingtonpost.com/news/national/wp/2018/11/21/feature/federal-prisons-were-told-to-improve-inmates-access-to-mental-health-care-theyve-failed-miserably/?noredirect=on&utm_term=.1459adaef2cd

**The need to avoid unwarranted sentencing disparities**. Though they certainly played a lesser role in the conspiracy in this case, many of Alberto's co-defendants have received sentences, or plea agreements that call for sentences, that are much lower than 10 years.  For instance, Alberto's girlfriend and mother to his children's plea calls for 48 months.  *See* Bahe Plea Agreement [Doc. 528].  Elizabeth Monroy's plea also calls for a 48 month sentence.  *See* Monroy Plea [Doc. 385].  Alberto's brother's plea calls for less than 10 years because of his eligibility for the safety valve. *See* Plea [Doc. 397].  A guideline sentence for Alberto of either 15 years or 19 ½ years would certainly create a disparity from the four year sentences or less, that many of his co-defendants are likely to receive.  A 10-year sentence on the other hand would minimize the sentencing disparity and more accurately reflect the differences in roles played by these co-defendants and Alberto.

## CONCLUSION

For the reasons discussed above, Mr. Alberto Terrazas-Ignacio requests that the Court give the methamphetamine guidelines the little weight they deserve and impose a sentence of 10 years, as such a sentence would be sufficient but not greater than necessary in light of the § 3553(a) factors.  Such a sentence would reflect that the conduct committed by Alberto while serious, was done by a young, uneducated, cognitively impaired man whose future will be better spent caring for his children then languishing in prison.

Respectfully submitted,
The Law Office of Ryan J. Villa

/s/  *Ryan J. Villa*
RYAN J. VILLA
Counsel for Defendant
2501 Rio Grande Blvd NW, Suite A
Albuquerque, New Mexico 87104
(505) 639-5709
ryan@rjvlawfirm.com

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system to opposing counsel, AUSA Sarah Davenport, on this 25th day of January 2019.

*/s/ Ryan J. Villa*
RYAN J. VILLA