IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,           )
                                    )
                Plaintiff,          )        CRIMINAL NO. <u>17-CR-1032 RB</u>
                                    )
        vs.                         )
                                    )
**ALBERTO TERRAZAS-IGNACIO,**       )
                                    )
                Defendant.          )

<u>**UNITED STATES' RESPONSE TO DEFENDANT ALBERTO TERRAZAS-IGNACIO'S
SENTENCING MEMORANDUM AND SENTENCING OBJECTIONS**</u>

The United States hereby responds to Defendant Alberto Terrazas-Ignacio's Sentencing

Memorandum and Sentencing Objections.  Docs. 586, 611.  The Defendant argues that a downward

variance in this case is warranted, and that the Court should sentence Defendant to a sentence of 120

months.  The United States respectfully requests that the Court deny Defendant's request for a

downward variance to a sentence of 120 months.  Instead, the United States respectfully requests that the

Court sentence the Defendant to 240 months, which is the high-end of the parties' stipulated sentencing

range, pursuant to the Defendant's Rule 11(c)(1)(C) Plea Agreement.

   I.   BACKGROUND

        a.  *Procedural Summary*

        On April 19, 2017, the Defendant and his 22 co-defendants were charged by the Grand Jury in a

44-count indictment with, *inter alia*, conspiracy to distribute heroin, cocaine, and a mixture and

substance containing methamphetamine in violation of 21 U.S.C § 846, contrary to 21 U.S.C.

§§ 841(a)(1), (b)(1)(A).  Doc. 2.  Subsequently, on August 16, 2017, the Superseding Indictment was

filed by the Grand Jury in this case.  Doc. 269.  The only substantive difference between the Indictment

and the Superseding Indictment is in the forfeiture allegation, which now includes a vehicle taken from

one of the co-defendants in this case, Alfonso Rios, but is not related to the Defendant.  Also removed from the forfeiture allegation were the specific amount of a potential money judgment and the "joint and several liability" language.  The charges and overt acts remain the same as they were originally charged.

On April 26, 2018, the Defendant pled guilty, with the benefit of a plea agreement, to Counts 1, 2, 6, 16, 26, 44, 20, 21, and 25 of the 44-count Superseding Indictment.  Docs. 419-420. Count 1 charged Conspiracy to Possess with Intent to Distribute One Kilogram and More of Heroin, in violation of 21 U.S.C. § 846. Count 2 charged Possession with Intent to Distribute One Kilogram and More of Heroin, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.  Count 6 charged Possession with Intent to Distribute 500 Grams and More of a Mixture and Substance Containing a Detectable Amount of Methamphetamine, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.  Counts 16, 26, and 44 charged Possession with Intent to Distribute One Kilogram and More of Heroin, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.  Counts 20 and 21 charged International Money Laundering, and Aiding and Abetting, in violation of 18 U.S.C. § 1956(a)(2)(A), and 18 U.S.C. § 2. Count 25 charged Possession with Intent to Distribute 50 Grams and More of Methamphetamine, and Aiding and Abetting, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A), and 18 U.S.C. § 2.

A presentence report (PSR) was disclosed on October 18, 2018, assessing the Defendant's base offense level at 38, pursuant to USSG § 2D1.1(a)(5).  Doc. 573 at 10.  After receiving a two-level enhancement pursuant to 18 U.S.C. § 1956, and a three-level reduction for acceptance of responsibility, the Defendant's total offense level is 37.  *Id*. at 10-11.  Based on a total offense level of 37 and a Criminal History Category of II, the PSR calculates the Defendant's resulting guideline imprisonment range as being 235 to 293 months.  *Id*. at 18.

On July 2, 2018, the Defendant filed his Objections to the Presentence Report, Doc. 568, and on January 25, 2019, the Defendant filed his Sentencing Memorandum.  Docs. 611.  The Defendant's sentencing hearing has set for February 13, 2019.  Doc. 606.

  *b.  Factual Background*

As set forth in the Superseding Indictment and the defendant's PSR, it is clear that the defendant was part of a large drug trafficking organization (DTO) that was responsible for transporting methamphetamine, cocaine, and heroin from the El Paso, Texas, and Southern New Mexico area, to Albuquerque, New Mexico, and elsewhere.  Doc. 587 at 8.  Over the course of the 16-month investigation, the DTO was responsible for at least 23.969 kilograms of methamphetamine, 6.813 kilograms of cocaine, 49.48 kilograms of heroin, and an additional 28.166 kilograms of a mixture and substance containing methamphetamine.  *Id*.

During the investigation, Luis Angel Briseño-Lopez (Briseño) was identified as the Mexican-based source of supply of the DTO.  Briseño supplied and directed the importation, transportation, and delivery of drugs and drug proceeds.  Briseño's organization was comprised of three separate "transportation crews" – individually headed by the Defendant, and co-defendants Jose Manuel Ortiz-Campos (Ortiz) and Joshua Jande Carmona (Carmona).  The Defendant's crew comprised of his brother Ricardo Terrazas-Ignacio, his girlfriend Roderica Bahe, Martin Contreras, Jose Lucero, and Priscilla Mollfulleda.  Ortiz, Carmona, and the Defendant each received drugs and instructions from Briseño, located in Mexico.  Although each was operating his own crew, Ortiz, Carmona, and the Defendant all knew each other, worked together, and knew that the others were also delivering Briseño's drugs to the same customers.  At times, one crew would front, or deliver on consignment, drugs to customers in Albuquerque and at the same time pick up money from other customers.  Then a few days later, members of a different crew would pick up drug proceeds from the first set of customers and deliver

drugs to others.  There was interchangeability between the transportation crews.  However, the people

working for Ortiz, Carmona, and the Defendant did not appear to have any knowledge of the existence

other transportation crews.

On the following dates, the Defendant transported or hired others to transport drugs and drug

proceeds:

On May 19, 2016, the Defendant and Carmona, on behalf of Briseño, met with another drug

transporter, later identified as Rene Lerma (Lerma), and assisted in the transportation of 5.576 kilograms

of methamphetamine that was destined for Ohio.  Doc. 573 at 9.  However, law enforcement in Illinois

arrested Lerma and seized the methamphetamine before it arrived in Ohio.  *Id.*

As the PSR notes in paragraph 47, on June 15, 2016, the Defendant was arrested in Oklahoma

City, Oklahoma, after Oklahoma City Sheriff's Department seized approximately 12 pounds of

methamphetamine from a white Jeep SUV that he was driving.  Doc. 573 at 13.  An Oklahoma City

Sheriff's deputy pulled the Jeep over because of a traffic infraction.  *Id.*  After the deputy identified the

Defendant as the driver, the deputy identified the female passenger as Priscilla Mollfulleda.[1]  No other

individuals were in the vehicle.  *Id.*  Mollfulleda was the registered owner of the Jeep.  *Id.*  The 12

pounds of methamphetamine was discovered inside a plastic shopping bag, in the cargo area of the Jeep,

covered in clothing.  *Id.*  On or about June 28, 2016, the Defendant and Mollfulleda were released on

---

[1]  In his sentencing memorandum, the Defendant inaccurately states that the passenger was the Defendant's girlfriend, Roderica Bahe.  Although the facts surrounding the Defendant's arrest on June 15, 2016, were provided to the Defendant and Probation, as the PSR notes the investigative material in this case is extensive, and for conciseness, they were not included in the Offense Conduct of the Defendants' PSR. The reports regarding these facts can be found at: Las Cruces DEA Form 6 entitled, "Arrest of Albert TERRAZAS on June 15, 2016," bates-stamped as US v. BRISENO-LOPEZ, et al. LC DEA 6s_ on pages 73-74 in the discovery; *see also* Reports from Oklahoma City Sheriff's Department, bates-stamped as US v. BRISENO-LOPEZ, et al. Other Agency Reports_ on pages 66-97 in the discovery. The governments requests that the facts surrounding the Defendant's June 15, 2016, arrest be incorporated into the PSR.

bond.  The lab report from Oklahoma indicated that the total net weight of the methamphetamine was approximately 4.44 kilograms.[2]  This methamphetamine should be calculated as relevant conduct.

On October 6, 2016, the Defendant sent his brother, Ricardo Terrazas-Ignacio (Ricardo) to a stash house located in El Paso to obtain drugs, including three "chatos," or pounds, of heroin that was to be delivered to customers in the Belen and Albuquerque areas. Doc. 574 at 9.[3]  After Ricardo picked up the heroin, the Defendant, Ricardo, and an unidentified female transported the heroin through the U.S. Border Patrol checkpoint located on mile marker 26 on Interstate 25 – with the female driving Ricardo's vehicle through the checkpoint.  *Id*.  As the female drove Ricardo's white Nissan Sentra through the checkpoint, License Plate Reader photographs show that the Defendant and Ricardo were right behind her in the Defendant's black Cadillac.  *Id*.  After successfully crossing the checkpoint with the illegal drugs, the Defendant sent a text message to Briseño advising the drugs had "crossed already."  *Id*.  Briseño responded that the drug customers were too busy conduct the drug deals.  *Id*.  As a result, the Defendant advised he would keep the product safe until the following day.  *Id*.

The next day, on October 7, 2016, the Defendant delivered 1.36 kilograms of heroin to Juan Gutierrez (Gutierrez) in Belen, NM.  Doc. 573 at 9. Shortly after the Defendant had delivered the heroin to Gutierrez, at approximately 10:45 a.m., on October 7, 2016, in session A1143 on the Defendant's phone, Target Telephone 8, the Defendant sent a text message to Briseño stating that Gutierrez had provided the Defendant with $9,200 of drug proceeds for Briseño ("Juan gave me 9200").[4]

---

[2] *See* Oklahoma City Police Department Forensic Examination Report, bates-stamped as US v. BRISENO-LOPEZ, et al. LC Lab Reports on page 23 of the discovery.

[3] Although these facts were includes in the co-defendant's PSR, these facts were not included in the Offense Conduct of the Defendants' PSR. The reports and linesheets regarding these facts were disclosed to both the Defendant and Probation, and they can be found at: Las Cruces DEA Form 6 entitled, "Surveillance of Ricardo TERRAZAS and Albert TERRAZAS, October 6 and 7, 2016," bates-stamped as US v. BRISENO-LOPEZ, et al. LC DEA 6s_ on pages 177-181 in the discovery. The governments requests that these facts be incorporated into the PSR.

[4] *See* Albuquerque DEA Form 6 entitled, "Surveillance of Albert TERRAZAS at 137 Camino de Los Chavez, Belen, NM on October 7, 2016 and Acquisition of Exhibit N-17" and bates-stamped as US v. BRISENO-LOPEZ, et al. ABQ DEA 6s_ on pages 86-92 in the discovery.

After the Defendant's deal with Juan Gutierrez, the Defendant met with Gustavo Hernandez-Loaiza (Hernandez) to collect $24,000 in drug proceeds to be delivered to Briseño. Doc. 573, para. 20. Approximately five minutes after the Defendant met with Hernandez, the Defendant exchanged a series of text messages, in sessions A1270, A1272, A1274, A1276, A1278, and A1280, on Target Telephone 8, with Briseño.[5] The Defendant told Briseño that Hernandez provided the Defendant with $24,000 in drug proceeds ("I already got the paper Luis he gave me 24 how much should I get to put in my safe so I can take off"). *Id*. Briseño responded by telling the Defendant to take $4,000 as payment for the deliveries and money pickups ("Listen take 4 buddy"). *Id*. The Defendant then told Briseño that the Defendant would be taking the $4,000 from the $9,200 that was given by Gutierrez because it was wrapped more loosely than the money he'd received from Hernandez ("I'll take it from Juanito's from the 9200 because the wraps are loose and the 24000 are sealed."). *Id*. Based on these communications, the Defendant received a total of $33,200 in drug proceeds ($9,200 from Juan Gutierrez and 24,000 from Gustavo Hernandez-Loaiza) to be delivered to Briseño. *Id*.

On October 10, 2016, the Defendant and co-defendant, Martin Contreras (Contreras) attempted to transport 2.38 kilograms of heroin and 4.82 kilograms of methamphetamine, on behalf of Briseño, to Albuquerque when law enforcement officers stopped Contreras' vehicle and seized the heroin and methamphetamine near Hatch, NM. Doc. 573 at 9.

On March 10, 2017, the Defendant and Bahe hired Jose Lucero (Lucero) to transport 9.32 kilograms of heroin and 987 grams of cocaine in a rental car through the U.S. Border Patrol checkpoint near Las Cruces, NM. *Id*. Law enforcement arrested Lucero and seized the heroin and cocaine at the checkpoint. *Id*.

---

[5] *See* Albuquerque DEA Form 6 entitled, "Surveillance of Albert TERRAZAS at 137 Camino de Los Chavez, Belen, NM on October 7, 2016 and Acquisition of Exhibit N-17" and bates-stamped as US v. BRISENO-LOPEZ, et al. ABQ DEA 6s_ on pages 86-92 in the discovery.

On April 21, 2017, agents intercepted communications over the Defendant's phone that indicated the Defendant and Ricardo were going to deliver the Ricardo's white Nissan Sentra to an unknown individual in El Paso, and that individual was then going to take the car across the border to have an after-market trap installed to facilitate the transportation of drugs for this organization.[6]  Following these intercepted communications, agents observed the Defendant and Ricardo transporting the white Nissan Sentra to El Paso, and providing the vehicle to two unknown male individuals.  *Id*.  After the exchange, agents observed the white Nissan Sentra proceeded into Mexico.  *Id*.

On April 27, 2017, agents intercepted communications over the Defendant's phone indicating Bahe and the Defendant's 15-year-old brother had traveled to Ciudad Juarez, on behalf of the Defendant, to pick up the Ricardo's car (the white Nissan Sentra).[7]  During this time, agents intercepted calls between Bahe and the Defendant stating the Mexican police pulled Bahe and the 15-year old brother over because the police thought they had drugs in the car, but eventually let them go.  *Id*. During the second call, Bahe confirmed with the Defendant that the car was not loaded and the Defendant assured her that it wasn't because they were supposed to get "the work" the following day. *Id*.

The next morning, on April 28, 2017, at approximately 6:02 a.m., Bahe, Ricardo Terrazas-Igancios, and the Defendant were arrested at the Defendant's parents' house in Las Cruces.[8]  After the

---

[6] Although these facts were included in two co-defendants' PSRs, these facts were not included in the Offense Conduct of the Defendants' PSR. The reports and linesheets regarding these facts were disclosed to both the Defendant and Probation, and they can be found at: Las Cruces DEA Form 6 entitled, "Surveillance of Albert TERRAZAS, on April 21, 2017, in El Paso, TX," bates-stamped as US v. BRISENO-LOPEZ, et al. LC DEA 6s_ on pages 308-310 in the discovery; Las Cruces DEA Form 6 entitled, "Supplemental Report: Surveillance of Albert TERRAZAS, on April 21, 2017, in El Paso, TX," bates-stamped as US v. BRISENO-LOPEZ, et al. LC DEA 6s_ on pages 327-328 in the discovery; and *see also* "Linesheets for Target Telephone 18," bates-stamped as US v. BRISENO-LOPEZ, et al LS TT18 on pages 124-125, 127 in the discovery. The governments requests that these facts be incorporated into the PSR.

[7] *See id.*; *see also* "Linesheets for Target Telephone 18," bates-stamped as US v. BRISENO-LOPEZ, et al LS TT18 on pages 124-125, 127 in the discovery.

[8] *See* Las Cruces DEA Form 6 entitled, "Arrest of Albert Terrazas, Ricardo Terrazas and Roderica Bahe and the Acq. of Ex 20, N-38, N-40 and N-203 on 04-28-2017 in Las Cruces, NM," bates-stamped as US v. ALBERTO TERRAZAS-IGNACIO on pages 1-5 in the discovery. The governments requests that these facts be incorporated into the PSR.

arrest of the defendants, the Defendant's parents gave agents verbal and written consent to search their residence. During the search, agents found a black bundle wedged between the nightstand and the wall in the bedroom that Bahe and the Defendant had been sleeping.  *Id*.  The black bundle contained 454 net grams of methamphetamine.[9]  This methamphetamine should be calculated as relevant conduct.

Additionally, following the arrest of Bahe, Ricardo Terrazas-Igancios, and the Defendant, agents searched the Defendant's white Nissan Sentra and discovered an after-market trap with screws that had been installed in the floor boards of both the driver side and front passenger side compartments of the vehicle.[10]

II.  OBJECTIONS TO THE PRESENTENCE REPORT

A.  *The Defendant's objection to Paragraph 23 of the PSR – Disagreement as to the amount in question being $33,200, not $54,000*

In his Objections to the Presentence Report, the Defendant argues that pursuant to the admission of facts in paragraph 14 of the Defendant's Plea Agreement, the amount in question in paragraph 23 of the Defendant's PSR is $33,200, not $54,200.  Doc. 586 at 1.  The United States agrees.

Based on the facts mentioned-above as well as the Defendant's admission of facts in his Plea Agreement, the United States agrees that the amount of drug proceeds that the Defendant transported to Briseño in Mexico was $33,200 because the intercepted communication show that the Defendant had received $9,200 from Juan Gutierrez and $24,000 from Gustavo Hernandez-Loaiza on October 7, 2016.

---

[9] *See* DEA FORM 113, Lab Report for Exhibit 20, bates-stamped as US v. BRISENO-LOPEZ, et al. LC Lab Reports on page 21 of the discovery.

[10] *See* Las Cruces DEA Form 6 entitled, "Arrest of Albert Terrazas, Ricardo Terrazas and Roderica Bahe and the Acq. of Ex 20, N-38, N-40 and N-203 on 04-28-2017 in Las Cruces, NM," bates-stamped as US v. ALBERTO TERRAZAS-IGNACIO on pages 1-5 in the discovery.

B. *The Defendant's objection to Paragraph 30 of the PSR – The application of the 2-level enhancement pursuant to 2S1.1(b)(2)(B)*

In his Objections to the Presentence Report, the Defendant argues that pursuant to Application Note 3(C), the 2-level enhancement in paragraph 30 of the PSR should not apply.  Doc. 586 at 1.  The United States respectfully disagrees.

Under the money laundering guideline, USSG § 2S1.1, the PSR writer correctly used the drug quantity table under section 2D1.1(c) to determine that the base offense level is 38. USSG § 2D1.1(c). The PSR writer then correctly applied the specific offense characteristic of the money laundering guideline and added two-levels under § 2S1.1(b)(B) because the Defendant was convicted under 18 U.S.C. § 1956, not 18 U.S.C. § 1957. § 2S1.1(b)(2)(B).  Thus, the Defendant's adjusted offense level for the money laundering offense is 40.

Assuming that the Defendant is objecting to the two-level enhancement under § 2S1.1(b)(B) because the Defendant was convicted under 18 U.S.C. § 1956.  The two-level enhancement in USSG § 2S1.1(b)(2)(B) for convictions under 18 U.S.C. § 1956 is not impermissible double counting because the base offense level does not take into account the various types of money laundering.  *See United States v. Demarest*, 570 F.3d 1232, 1243 (11th Cir. 2009); *Arrollo-Silva v. United States*, 2017 WL 2117321, at *2 (E.D.N.C. April 13, 2017) (report and recommendation), adopting R&R, 2017 WL 2082885 (E.D.N.C. May 5, 2017), *appeal dismissed*, 703 F. App'x 206 (4th Cir. 2017).  In other words, the two-level enhancement was not impermissible double counting because the Defendant's violation of 18 U.S.C. § 1956 was not factored into his base offense level.  *Id.*  The base offense level for money laundering does not distinguish between the various money-laundering statutes, *see* USSG. § 2S1.1(a) (covering violations of 18 U.S.C. §§ 1956, 1957, 1960), but the enhancements do, *see id.* § 2S1.1(b)(2)(A) (applying a one-level enhancement for violation of 18 U.S.C. § 1957); *id.* § 2S1.1(b)(2)(B) (applying a two-level enhancement for violation of 18 U.S.C. § 1956).  The plain

language of the section is clear--subsection (a) and (b) are separate, distinct, and serve unique purposes. The Sentencing Commission discussed this section in its explanation for Amendment 634 and made clear how courts are to apply these enhancements:

> As a result of the enhancements provided by subsections (b)(2)(A), (b)(2)(B), and (b)(3), all direct money launders will receive an offense level that is one to four levels greater than the Chapter Two offense level for the underlying offense, depending on the statute of conviction and sophistication of the money laundering offense.

Sentencing Guidelines Manual App. C (Vol. II) 223; *see also United States v. Hodge*, 558 F.3d 630, 637 (7th Cir. 2009) (citing same).  Third, district courts apply the two-level increase in these types of cases with regularity. *See, e.g., United States v. Tehin*, WL 836713, at *2 (9th Cir. March 16, 2007) (affirming the trial court's application of the two-level increase); *Valenzuela v. United States*, WL 1852993, at *7 (D. Haw. May 21, 2012) ("Valenzuela is factually incorrect in asserting that the two-level enhancement for her 18 U.S.C. § 1956 conviction amounted to double counting.  That enhancement was applied only once, and nothing else in the guideline calculation addressed a 18 U.S.C. § 1956 conviction specifically. There was no double counting involved with her sentencing."); *United States v. Sickels*, WL 1526979, *1 (D. Nev. April 20, 2011) (reaffirming the two-level increase).  Therefore, the Court should reject the Defendant's argument and find that the 2-level increase pursuant to 2S1.1(b)(2)(B) is warranted.

  C. *The Defendant's objection to Paragraph 41 of the PSR – The assessment of one criminal history point for the Defendant's Possession of Alcoholic Beverage by a Minor*

   In his Objections to the Presentence Report, the Defendant argues that one criminal history point should not be assessed because the Defendant's conviction for possession of alcoholic beverages by a minor is similar to a juvenile status offense which is not counted under § 4A1.2(c)(2).  Doc. 586 at 1.

   Section 4A1.2 of the Guidelines is entitled "Definitions and Instructions for Computing Criminal History." Subsection (c)(2) thereof states, in pertinent part:

> Sentences for all felony offenses are counted. Sentences for misdemeanor and petty offenses are counted, except as follows:

\* \* \*

    (2) Sentences for the following prior offenses and offenses similar to them, by whatever name they are known, are never counted:

        Fish and game violations

        Hitchhiking

        Juvenile status offenses and truancy

        Local ordinance violations (except those violations that are

        also violations under state criminal law)

        Loitering

        Minor traffic infractions (e.g., speeding)

        Public intoxication

        Vagrancy.

USSG § 4A1.2(c)(2).

The Commentary to § 4A1.2(c) states, in pertinent part:

    In determining whether an unlisted offense is similar to an offense listed in subsection ... (c)(2), the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishment imposed for the listed and unlisted offenses; (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense; (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

USSG § 4A1.2(c)(2), comment. (n.12(A)).

In *United States v. Archuleta*, the Tenth Circuit held "that to qualify as a juvenile status offense, an offense must be (1) committed by a person younger than eighteen years of age, (2) involve conduct that would be lawful if engaged in by an adult, and (3) be non-serious in nature." *United States v. Archuleta***,** 865 F.3d 1280, 1290 (10th Cir. 2017) (quoting *United States v. Landa*, 642 F.3d 833, 838 (9th Cir. 2011) and citing *United States v. Webb*, 218 F.3d 877, 880 (8th Cir. 2000), *United States v. Correa*, 114 F.3d 314, 318-19 (1st Cir. 1997), and *United States v. Ward*, 71 F.3d 262, 263 (7th Cir. 1995)).  Further, the Tenth Circuit determined that Archuleta's minor in possession of marijuana conviction was plainly a juvenile status offense because: 1) Archuleta's offense conduct occurred when

he was 17 years old; 2) Archuleta's conduct – possession of less than one ounce of marijuana – involved conduct, under Colorado law, that would have been lawful if engaged in by a person over the 21 years old; and 3) the penalty imposed for the crime was a small monetary fine, which indicated to the Court that the conduct was non-serious in nature.

Applying those requirements to the facts presented here, the government does not dispute that the Defendant's conduct –possession of alcoholic beverages by a minor– under New Mexico law, would have been lawful if engaged in by a person over the 21 years old; and the conduct appears to be non-serious in nature because the penalty imposed for the crime, i.e., a small monetary fine, indicates that the New Mexico legislature does not view the offense as serious. *See* N.M.S.A. 1978, § 60-7B-1 (A first time offender may be fined an amount not more than $1,000 and ordered by the sentencing court to perform thirty hours of community service related to reducing the incidence of driving while under the influence of intoxicating liquor). Furthermore, the offense did not involve any violent conduct or conduct that otherwise posed a risk of harm to any other person or object.

With respect to the first prong, the Defendant was 18 years old when he committed the offense count.  Thus, it would seem that the Defendant cannot satisfy the first prong of the Tenth Circuit's test. However, there is some dispute over whether a conviction for possession of alcohol by a minor qualifies as a juvenile status offense if a defendant was over the age of 18 at the time of arrest. The Sixth Circuit held that possession of alcohol by someone under the age of 21 is *similar* to a juvenile status offense. *United States v. Cole*, 418 F.3d 592, 599-600 (6th Cir. 2005), *superseded* by Sentencing Commission change to multi-factor test *as recognized by United States v. Kitchen*, 428 Fed. App'x. 593, 599 (6th Cir. 2011) (unpublished).  In *Cole*, the Sixth Circuit was persuaded by Cole's argument that his convictions for being a minor in possession of alcohol, all obtained when he was nineteen years old, were *similar to* a juvenile status offense. Specifically, the Sixth Circuit noted:

> [A] juvenile status offense is an offense which is illegal only because of the offender's age (under eighteen) and which is not serious. Under Michigan law, being a minor in possession of alcohol is an offense which is criminalized only because of the offender's age (under twenty-one). It is not a "serious" offense. The crux of both offenses is that they criminalize behavior for people of a certain age that is legal for people of a certain (greater) age. Indeed, in cases involving defendants under the age of eighteen, being a minor in possession of alcohol would not simply be similar to a juvenile status offense, it would constitute a juvenile status offense. We find it difficult to imagine two distinct offenses with more similar "essential characteristics," and have no difficulty concluding that being a minor in possession of alcohol is similar to a juvenile status offense, under § 4A1.2(c)(2).

*Id.* at 599-600. Essentially, the Sixth Circuit held that it was only the age of the defendant that converted an otherwise lawful act into a crime. *Id.* Consequently, the offense was properly considered a "juvenile status offense." *Id.*

In *Webb*, the Eighth Circuit held that the conviction of a 19 year old for underage possession of alcohol was not a "juvenile status offense." 218 F.3d at 880. However, in the later case, *United States v. Johnston,* 533 F.3d 972, 977–78 (8th Cir. 2008), the Eighth Circuit noted that *Webb* had not decided the "similar to" question under § 4A1.2(c)(2) and quoted the Sixth Circuit's analysis in *Cole,* but declined to reach the question because any error would have been harmless.

The Ninth Circuit, in dicta, held that because a defendant was an adult at the time of his arrest, he was underage for purposes of California's drinking laws, which set the minimum age for legal acquisition of alcohol at 21 years old. *See Landa*, 642 F.3d at 838.

Finally, in *United States v. Whitney,* 229 F.3d 1296, 1309–10 (10th Cir.2000) the Tenth Circuit hypothesized that a minor in possession conviction could meet the definition of "juvenile status offense" because the defendant's conduct in possessing alcohol was "criminal solely as a result of his status as being under the legal drinking age of 21." However, the Tenth Circuit also recognized that other circuits "have concluded that 'juvenile status offenses' include *only* those status offenses committed by persons under eighteen; they must be non-serious offenses*;* and regardless of the title of the offense, the underlying conduct would not have been criminal if committed by an adult." *Id.* (citing *Correa,* 114

13

F.3d at 318–19, and *Ward,* 71 F.3d at 263)) (emphasis added). "Applying these holdings, Mr. Whitney's prior conviction of 'Minor in Possession' would not be considered a 'juvenile status offense' within the meaning of § 4A1.2(c)(2) because he committed the offense when he was 19, and because his actual conduct underlying his conviction, 'Transporting Open Container' and 'Driving Under the Influence,' would have been criminal if committed by an adult." *Id.* (citing *Correa*, 114 F.3d at 318–19, and *Ward,* 71 F.3d at 263). The Tenth Circuit held, "there is no well-settled law establishing the court made a clear and obvious error in including the 'Minor In Possession' offense in Mr. Whitney's criminal history." *Id.* The Tenth Circuit concluded with "[w]e take no position on the correctness of this result." *Id.*

Regardless of whether the Court includes or excludes the Defendant's possession of alcoholic beverages by a minor conviction in his criminal history, this Criminal History Category will remain the same, II.

D. *The United States' objects to Paragraphs 23 and 32 of the PSR regarding the lack of a role assessment*

The Defendant was directing other people and the criminal activity involved more than five people. Therefore, it is the government's position that though he might not be considered and organizer or leader, the Defendant certainly was a manager or supervisor. Therefore, a 3-level increase to the offense level is warranted to pursuant to USSG § 3B1.1(b).

The plea agreement is silent as to the Defendant's role because the assessment does not make a difference should the Court accept the parties' Rule 11(c)(1)(C) agreement to sentence the Defendant between 10 and 20 years. However, it is the government's position that an upward role adjustment is nonetheless warranted and should be included in the PSR so that guidelines range is accurately calculated and provides the correct starting place for the Court in its determination as to whether it will accept the plea agreement. Additionally, a sentencing court must base its sentencing decision on an

accurate calculation of the defendant's guidelines sentencing range for the offense of conviction.  *See*

*United States v. Archuleta*, 865 F.3d 1280, 1292 (10th Cir. 2017).

In support of this position, the government first points to the factual basis in the Defendant's plea

agreement:

> Between April 17, 2016, and April 28, 2017, I agreed and was working with other people to transport and distribute drugs in New Mexico and elsewhere.  My role was to obtain drugs that were brought into the United States in the Southern New Mexico and El Paso, Texas area, and then transport and deliver the drugs to other people in Albuquerque, as well as other locations further within the United States.  Sometimes, I transported the drugs myself.  **Other times, I provided drugs to couriers who then transported the drugs all or part of the way to the destination**.  Also, I collected drug proceeds and transported them for delivery to Mexico. As part of my role with this drug trafficking organization, on May 19, 2016, I assisted another courier transporting 5.58 kilograms of a mixture and substance containing methamphetamine from New Mexico to Illinois. On October 6 and 7, 2016, I transported and delivered 1.82 kilograms of heroin to another person in Belen, New Mexico. On October 7, 2016, I picked up a total of $33,200 in drug proceeds from two different people in the Albuquerque area, and I transported the money for delivery to another person in Mexico. **On October 10, 2016, I hired a driver to transport 4.82 kilograms of methamphetamine and 2.38 kilograms of heroin from Las Cruces to Albuquerque. On March 10, 2017, I hired a driver to transport 9.32 kilograms of heroin and 987 grams of cocaine from Las Cruces to Albuquerque.**

Doc. 419, para. 14, emphasis added. Second, the government points to paragraph 17 of the Defendants

PSR, which states, "Typically, once Alberto Terrazas-Ignacio obtained the drugs he was transporting **he**

**would have a driver take the load vehicle through the I-25 checkpoint while followed or drove**

**ahead of the load vehicle**. Once through the checkpoint, Alberto Terrazas-Ignacio would take the load

vehicle back and would drive it himself the rest of the way to Albuquerque."  Doc. 573 at 9.

Section 3B1.1 of the sentencing guidelines permits a district court to assess up to a four level

enhancement based on a defendant's role in the offense.  The sentencing guidelines provide that a

defendant's total offense level should be increased by three levels if he or she "was a manager or

supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or

was otherwise extensive...." USSG § 3B1.1(b).  An enhancement under this section requires the

involvement of at least one "participant" other than the defendant, and a "participant" is defined as a "person who is criminally responsible for the commission of the offense." *United States v. Gallant,* 537 F.3d 1202, 1241 (10th Cir. 2008).

USSG § 3B1.1 does not define the terms "manager," "supervisor," "organizer," or "leader." Instead, the Commentary provides several factors to consider in "distinguishing a leadership and organizational role from one of mere management or supervision." USSG § 3B1.1, comment. (n.4). Those factors are "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." *Id.*

Relying on these factors, this court has consistently interpreted the "manager/supervisor" role as one requiring the defendant to exercise some degree of "decision-making authority," "control," or "organizational authority" over a subordinate participant in the offense. *See, e.g., United States v. Beltran,* 571 F.3d 1013, 1020–21 (10th Cir. 2009) (noting that for a three-level enhancement to apply, "defendant must also exercise some degree of 'decision-making authority or control over a subordinate'"); *United States v. Pena-Hermosillo,* 522 F.3d 1108, 1112 (10th Cir. 2008) (same); *United States v. Gonzalez Edeza,* 359 F.3d 1246, 1248 (10th Cir. 2004) (explaining enhancement is appropriate when defendant is "responsible for organizing others for the purpose of carrying out the crime"). Furthermore, the Tenth Circuit has explained that a defendant need not be a drug kingpin to qualify for an enhancement under Section 3B1.1(c). *United States v. Backas,* 901 F.2d 1528, 1530 (10th Cir. 1990) ("In order to be a supervisor, one needs merely to give some form of direction or supervision to someone subordinate in the criminal activity for which the sentence is given.").

It is undisputed that the Briseño DTO involved five or more persons.  In fact, the Defendant's crew alone consisted of more than five – the Defendant, Mollfulleda, Bahe, Ricardo, Contreras, and Lucero.  The Defendant also exercised his decision-making authority by recruiting others to cross or transport drugs through the Border Patrol checkpoint.  Furthermore, the Defendant managed or supervised at least one other person, and he had direct contact with Briseño and local distributors to arrange the transportation of these drug loads.

More specifically, (1) on October 6, 2016, the Defendant directed his brother, Ricardo, to drive to El Paso to pick up heroin for the DTO, and later that same day, the Defendant recruited an unidentified female to cross the heroin through a U.S. Border Patrol checkpoint; (2) on October 1, 2016, the Defendant hired Contreras to help the Defendant transport heroin and methamphetamine from Las Cruces to Albuquerque; (3) on March 10, 2017, the Defendant and Bahe hired Lucero to cross heroin and cocaine through a U.S. Border Patrol checkpoint; and (4) on April 27, 2017, the Defendant sent Bahe and his younger brother to Mexico to pickup a vehicle that had been modified with an after-market hidden compartment. These activities sufficiently demonstrate the Defendant's role as a manager or supervisor in this drug and money laundering conspiracy. *See, e.g., Gonzalez Edeza,* 359 F.3d at 1248–49 (affirming three-level enhancement for "manager/supervisor" role on findings that defendant gave instructions to, directed the conduct of, and coordinated another participant's delivery of methamphetamine); *United States v. Pofahl,* 990 F.2d 1456, 1480-81 (5th Cir. 1993) (finding no error in applying § 3B1.1(b) to defendant who negotiated drug prices, recruited other conspirators, and directed other members of conspiracy).

Therefore, the Court should impose a 3-level enhancement under USSG § 3B1.1(b) for the Defendant's role in the offense.  After applying a 3-level enhancement for role, the Defendant's total

offense level becomes 40.  Based on a total offense level of 40 and a Criminal History Category of II, the Defendant's resulting guideline imprisonment range is 324 to 405 months.

III. THE 3553(a) FACTORS SUPPORT A SENTENCE OF 240 MONTHS.

After *United States v. Booker,* 543 U.S. 220 (2005) and *Rita v. United States,* 551 U.S. 338 (2007), the Supreme Court left intact all other provisions of the Sentencing Reform Act, including 18 U.S.C. § 3553(a).  Section 3553(a) continues to require sentencing judges to take certain factors into account when imposing a sentence, including "the kinds of sentence and the sentencing range established" by the guidelines. 18 U.S.C. § 3553(a)(4).  Therefore, the Court has an obligation to craft a sentence that sufficiently accounts for the sentencing factors and objectives outlined in 18 U.S.C. § 3553.

The Court must consider the nature and circumstances of the offense and the history and characteristics of the defendant. 18 U.S.C. § 3553(a)(1).  The Court should then fashion a sentence that reflects the seriousness of the offense; promotes respect for the law; and provides just punishment. 18 U.S.C. § 3553(a)(2).  The sentence should also adequately deter the defendant from committing further crimes; deter others similarly situated; protect the public from the defendant; and provide necessary education and treatment.  *Id.*  When formulating its sentence, the court must also avoid unwarranted sentencing disparities between defendants with similar records who have been convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6).

As noted by the Supreme Court, the guideline range is the benchmark and starting point for any federal sentence.  *Gall v. United States,* 128 S.Ct. 586, 596 (2007).  "Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline."  *Koon v. United States,* 518 U.S. 81, 98 (1996).  "[W]hether the particular case lies within the heartland of similar offenses is a threshold question that a district court must decide when

determining whether to grant a departure under the Guidelines." *United States v. Martinez-Barragan,* 545 F.3d 894, 900 (10th Cir. 2008).  This type of "heartland analysis is *also* a legitimate part of the district court's analysis of whether to vary from the Guidelines" under 18 U.S.C. § 3553. *Id.* (emphasis in original).

For the reasons stated herein, the United States asserts that a sentence of 240 months, which is 84 months lower than the applicable guideline range, would be sufficient, but not greater than necessary to comply with the sentencing factors in 18 U.S.C. § 3553(a).  The United States opposes any downward departure or variance to a sentence of 120 months.

> a.  *Nature, Circumstances, and Seriousness of the Offense*

The "starting point and initial benchmark" for sentencing must be the defendant's criminal conduct.  USSG Ch. 5, Pt. H, intro. Comment (citing *Gall*, 552 U.S. at 49).  Drug trafficking is a serious crime which "threaten[s] to cause grave harm to society."  *Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991) (the "possession, use, and distribution of illegal drugs represent one of the greatest problems affecting the health and welfare" of this country); *United States v. Carr,* 939 F.2d 1442, 1448 (10th Cir. 1991) ("Drug trafficking crimes are serious…").  Any attempt to describe drug distribution as "nonviolent and victimless . . . is false to the point of absurdity."  *Id*.  The offense the Defendant is charged with carries a statutory minimum of 10 years' imprisonment.  The Defendant is subjected to this minimum sentence because the evidence shows him to be a manager/supervisor and based on his criminal history, he is a not statutory safety valve.

The sentencing guidelines then balance these mitigating factors with the seriousness of his offense.  The guidelines' treatment of drug offenses reflects their "concurrence with Congress's judgment that the quantity of drug involved in an offense is an important measure of the seriousness of the offense, and the culpability of the offender."  *United States v. Reyes*, 9 F.Supp.3d 1196, 1229

(D.N.M. 2014) (quoting *United States v. Diaz*, No. 11-CR-821-2, 2013 WL 322243, at *14 (E.D.N.Y. Jan. 28, 2013)).  Given the countless fact patterns in drug-trafficking cases, "determining the actual culpability of the common drug courier is difficult…[T]ype and quantity [of drug] are the best proxies available." *Id.* at 1235.  They reflect the ultimate harm that the Defendant would have inflicted upon society if the drugs he carried had reached their end users.

The seriousness of the Defendant's offense in this case is measured by the extremely large quantity and the serious type of drugs that he trafficked – 13.4 kilograms of heroin, 5.576 kilograms of a mixture and substance containing methamphetamine, 9.714 net kilograms of pure methamphetamine, and 987 grams of cocaine. This calculation includes: 1) the 4.44 kilograms of methamphetamine seized from the Defendant on June 15, 2016; and 2) the 454 grams of methamphetamine seized from the Defendant and Ms. Bahe's bedroom on the date of their arrest.  The Defendant's base offense level remains 38, despite the addition of these two methamphetamine seizures.

In his sentencing memorandum, the Defendant argues that the Court should vary from the PSR's advisory range because of fundamental flaws in the Sentencing Commission's methamphetamine guidelines. Doc. 611 at 8-17.  The government does agree that the Commission's methamphetamine guidelines are fundamental flawed with respect to the Defendant's role as a manager/supervisor in this DTO.  However, even assuming arguendo that the Court decides to convert the pure methamphetamine in this case as being a methamphetamine mixture, the amount of drugs attributable to the Defendant is so overwhelming it does not drastically affect his base offense level.  For example, using the methamphetamine mixture conversion ratio, which indicates that every 1 gram of methamphetamine is converted to 2 kilograms of a converted drug weight, the 5.576 kilograms of a mixture and substance containing methamphetamine converts to 11,152 kilograms, and 9.714 net kilograms of pure methamphetamine converts to 19,428 kilograms.  Although that change reduces the Defendant's total

converted drug weight from 205,432 kilograms[11] to 44,297 kilograms, the resulting base offense level

only decreases by 2-levels to 36, instead of 38.[12]  In his sentencing memorandum, the Defendant

mistakenly asserts that the base offense level for 34,509.4 kg (which should be 48,226.8 kg, if the Court

finds the Defendant responsible for the methamphetamine seized from him in Oklahoma and the

methamphetamine seized from his bedroom) results in a new base offense level of 16.  This would be

the case if the total converted drug weight were at least *20 kilograms* but less than *40 kilograms* of

converted drug weight.  *See* USSG 2D1.1(c)(12) (Drug Quantity Table setting a base offense level of 16,

where the drug quantity involved "[a]t least 20 kg but less than 40 kg of converted drug weight").

However, the total converted drug weight actually involves at least *30,000 kilograms* but less than

*90,000 kilograms* of converted drug weight, which corresponds to a base offense level of 36.  *See* USSG

2D1.1(c)(12) (Drug Quantity Table setting a base offense level of 36, where the drug quantity involved

"[a]t least 30,000 kg but less than 90,000 kg of converted drug weight").  Thus, starting at a base offense

level of 36, and adding a 2-level enhancement pursuant to 18 U.S.C. § 1956, a 3-level enhancement for

role, and a 3-level reduction for acceptance of responsibility, the Defendant's total offense level would

be 38.  *Id*. at 10-11.  Based on a total offense level of 38 and a Criminal History Category of II, the

Defendant's resulting guideline imprisonment range would be **262 to 327 months**.  As such, the

Defendant's argument that the Court should vary downward to 120 months based on the guidelines'

methamphetamine ratios is flawed.

Even if the Court is pursued by the Defendant's argument, United States' recommended

sentenced of 240 months is still well below the applicable guideline range, 262 to 327 months, that

---

[11] This calculation includes: 1) the 4.44 kilograms of methamphetamine seized from the Defendant on June 15, 2016; and 2) the 454 grams of methamphetamine seized from the Defendant and Ms. Bahe's bedroom on the date of their arrest.

[12] In his sentencing memorandum, the Defendant's incorrectly asserts that his total converted drug weight would be reduce from 121,269.4 kg to 34,509.4 kg.  This calculation fails to include the converted drug weights for heroin (13,520 kg) and cocaine (197.40 kg). Thus, the total drug weight would be 48,226.8 kg (This calculation includes neither the Oklahoma methamphetamine seizure nor the methamphetamine from the date of the Defendant's arrest).

would be afforded to the Defendant if the pure methamphetamine in this case was converted using the methamphetamine mixture conversion ratio.

Of the drug amounts attributable to the entire Briseño drug trafficking organization, the Defendant is responsible for transporting and distributing approximately 27% of the organization's heroin, 20% of the organization's mixture and substance containing methamphetamine, 14% of the organization's cocaine, and 40% of the organization's pure methamphetamine.[13]  There is no doubt that this large amount of heroin, cocaine, and methamphetamine causes immeasurable harm in many people's lives after it has been distributed on the streets of New Mexico.  *See* Don J. Unser, Emilia's story: How the opioid epidemic has affected one family in Northern New Mexico, Las Cruces Sun News (Sept. 13, 2018), https://www.lcsun-news.com/story/news/local/new-mexico/2018/09/13/opioid-epidemic-northern-new-mexico-family-addiction-tradition/1279521002/.

Thus, a sentence of 240 months, the high-end of the parties' stipulated sentencing range, strikes an appropriate balance that reflects the seriousness of the Defendant's criminal behavior but also considers other factors under 18 U.S.C § 3553(a).

b. *History and Characteristic of the Defendant*

The Defendant was born in Las Cruces, New Mexico, in 1993.  Doc. 573 at 14.  Both of the Defendant's parents maintained steady employment and appear to have provided the basic necessities for the Defendant and his siblings.  *Id*.  The Defendant stated that he had a good childhood and that all of his needs were met.  *Id*.  The Defendant indicated that he has been in a relationship with Ms. Bahe since 2010, which resulted in the birth of his two children.  *Id*. at 15.  Because both the Defendant and Ms. Bahe are currently incarcerated, Ms. Bahe's sister is caring for their children.  *Id*.  The Defendant further advised that he is in good health.  *Id*.  The Defendant did report that in 2010, he suffered a brain

---

[13] This calculation includes the 4.44 kilograms of methamphetamine seized from the Defendant on June 15, 2016, and the 454 grams of methamphetamine seized from the Defendant and Ms. Bahe's bedroom on the date of their arrest.

injury caused by the ingestion of un-prescribed methadone.  *Id*.  As a result of this overdose, the Defendant was hospitalized (between December 11, 2010 and February 9, 2011) and then admitted to a rehabilitation center for two and a half weeks before he was released on February 26, 2011.  *Id*.

The Court should take notice that the Defendant has a criminal history spanning from the last six years, showing a pattern of disregard for the law.  Pursuant to 18 U.S.C. § 3553, the Court should note that despite the Defendant's relatively young age, he has incurred convictions for Possession of Alcoholic Beverages by a Minor, Attempt to Commit a Felony, to wit: Residential Burglary, Larceny, Contributing to the Delinquency of a Minor, Possession of a Controlled Substance PG less than 1 Gram; Doc. 573 at 11-14.  The Defendant has incurred an arrest for Burglary Dwelling House, Conspiracy to Commit a 3rd Degree Felony, and Conspiracy to Commit a 4th Degree Felony.  *Id*.  The Defendant also incurred an arrest related to the offense conduct as noted above, in Oklahoma, for Aggravated Trafficking in Illegal Drugs and Possession of Proceeds in Violation of UCDSA.  *Id*.

In his sentencing memorandum, the Defendant argues that this Court should vary downward to a 120-month sentence based, in part, on: his need to care for his children, his youth, and his brain injury. Based on these factors, the Defendant argues that the Court should vary downward to a sentence of 120 months.  *Id*.

The Defendant points out that because of the length of the sentence that he is facing, he may not be present for a majority of his children's lives.  *Id*.  While this is true, the Court must not forget that it was the Defendant's actions that separated him from his children.  Furthermore, what the defendant does not mention is that he is the one who involved the mother of his children in these crimes.  The Defendant recruited their mother into this DTO, which unfortunately has taken the children away from both parents.  While the defendant undoubtedly loves his children, his actions in this case did not demonstrate that love and are certainly not a reason to depart or vary to a sentence of 120 months.

Next, the Defendant alleges that his youth is also an important factor to consider in fashioning an appropriate sentence.  Doc. 481 at 2-3.  USSG § 5H1.1 provides, "(a)ge (including youth) may be relevant in determining whether a departure is warranted, if considerations based on age, individually or in combination with other offender characteristics, *are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines*.  USSG § 5H1.1 (emphasis added).  USSG § 5H1.1 further states that "[a]ge may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration."  USSG § 5H1.1.  Here, the circumstances surrounding the Defendant's age is not such that it falls outside the heartland of cases.  As the Court is well aware, many young defendants appear before it, and in fact, most of the co-defendants in this case are very young.  Ultimately, the Court in this case is neither faced with an exceptional situation nor an unusual case.  The Defendant, at age 25, is neither elderly nor infirm.  Additionally, the Defendant suffers from no physical ailments.  In fact, the Defendant relayed to the PSR writer that he was in good health. Doc. 573 at 15.

Although the Defendant did suffer from a prior brain injury, Dr. Westfried conducted a forensic examination[14] and found that the Defendant does not suffer from any "severe cognitive deficits or severe mental illness."  Doc. 611 at 3.  Dr. Westfried identified *potential* problems with concentration, memory, and visuospatial functions, but that the Defendant scored within normal ranges.  *Id*. (emphasis added).  According to Dr. Westfried, the Defendant displayed mild to moderate impairment of his manual motor functions, attention/concentration and proceeding speed, and executing functioning, as well as severely impaired visual memory functions.  *Id*.  As of writing this response, the government does not believe that there is anything evident from the description of the Defendant's brain injury

---

[14] Undersigned counsel has not yet received notification that this report or any other documents have been filed under seal, under separate cover.

which would justify a downward departure to a sentence of below 240 months. The government has taken into consideration the Defendant's 2010 brain injury and believes that a sentence of 240 months, which is 84 months lower than the applicable guideline range, is sufficient but not greater than necessary in light of the remaining § 3553(a) factors.

>   *c.* *The Need for the Sentence Imposed to Promote Respect for the Law, Provide Just Punishment, Adequate Deterrence and to Protect the Public from Further Crimes of the Defendant*

In violation of the laws of this country, the Defendant involved himself in this DTO by transporting and hiring others to transport illegal drugs and drug proceeds within the United States. Despite numerous interventions by law enforcement, at no point during the conspiracy was the Defendant ever deterred from transporting and distributing methamphetamine, heroin, and cocaine. In May 2016, after law enforcements seized 5.576 kilograms from the Defendant's friend, Rene Lerma, the Defendant continued his involvement in the DTO. In June 2016, after his arrest and release in Oklahoma, the Defendant continued his involvement in this DTO. However, instead of crossing the drugs himself, the Defendant got smart and began using couriers to transport drugs for him. In October 2016, after the seizure of methamphetamine and heroin from the Defendant and Contreras, the Defendant continued his involvement in the DTO. In March 2017, after the seizure of heroin and cocaine from Lucero, the Defendant continued his involvement in the DTO. In April 2017, after Mexican authorities stopped and searched Bahe and the Defendant's younger brother in Ciudad Juarez, the Defendant continued his involvement in the DTO. The Defendant repeatedly put the public, his co-defendant, his family, and himself a risk based on his actions during this drug trafficking conspiracy. In light of the Defendant's repeated disregard for our drug laws, a sentence of 240 months will certainly promote respect for the law, provide just punishment, deter the defendant from committing further

crimes and will serve to protect the public. *See United States v. Diaz-Martinez,* 468 F. App'x 880, 884

(10th Cir. 2012).

> d.  *The Need to Avoid Unwarranted Sentencing Disparities Between Defendants Who Have Committed Similar Crimes*

A 230 month sentence in the instant matter is necessary in order to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct.

18 U.S.C. § 3553(a)(6).  The sentencing guidelines set a range of 324 to 405 months for a defendant

with the present criminal history category and who is guilty of the present offense.  The Defendant is

essentially requesting a sentence of 120 months, which would result in a sentence that is approximately

37% of the sentence that would be assessed against a similarly situated defendant.  This is the exact sort

of disparity that the guidelines were designed to avoid.   Below is a summary of the agreements issued to

Ortiz and Carmona, the other two transportation crew leaders (including their role, the amount/type of

drug(s) attributable to them, and the length of their involvement in the DTO):

> a.  Jose Manuel Ortiz-Campos (manager/supervisor) – pled guilty with a Rule 11(c)(1)(C) agreement to 180-240 months (15-20 years) Doc. 450 (Ortiz was involved in the DTO from May 2016 until April 2017, and he is responsible for 6.82 net kilograms methamphetamine and 4.82 kilograms heroin and money laundering); and

> b.  Joshua Jande Carmona (manager/supervisor, but drove loads himself more often than not) - pled guilty with a Rule 11(c)(1)(C) agreement to 180-240 months (15-20 years) Doc. 496 (Carmona was involved in the DTO from May 2016 until October 2016, and he responsible for 11.43 net kilograms methamphetamine, 6 kilograms heroin, 10.56 kilograms of mixture and substance containing methamphetamine and money laundering);

The Defendant is essentially asking the Court to grant him a sentence that would be half of what the

other two crew leaders in this case are currently facing.  One of the critical purposes of the guidelines is

to provide certainty and fairness by avoiding unwarranted disparity among similarly situated offenders.

There is simply nothing in this case to warrant a variance to such a disparate sentence.  Rather, a

sentence of 240 months will further the important and intrinsically valuable end of ensuring uniformity.

*See e.g., United States v. Kristl,* 437 F.3d 1050, 1054 (10th Cir. 2006) ("[T]he purpose of the guidelines [is] to promote uniformity in sentencing so as to prevent vastly divergent sentences for offenders with similar criminal histories and offenses." (alternation in original)).

IV. CONCLUSION

Based on the above, the United States respectfully requests that the Court deny the Defendant's request for a downward variance to a sentence of 120 months.  Instead, the United States respectfully asks the Court to accept the plea agreement, find that a sentence of 240 months will be sufficient, but not greater than necessary under the circumstances, and sentence the defendant accordingly.

Respectfully submitted,

JOHN C. ANDERSON
United States Attorney

*Electronically Filed 2/8/2019*
SELESIA L. WINSTON
SARAH M. DAVENPORT
Assistant U.S. Attorneys
200 N. Church Street
Las Cruces, New Mexico 88001
Phone: (575) 522-2304
Fax: (575) 522-2391

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record.

*Electronically Filed 2/8/2019*
SELESIA L. WINSTON
Assistant U.S. Attorney